## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CIARA WEATHERSPOON**                    **CIVIL ACTION**

**VERSUS**                                **NO:    21-0225**

**739 IBERVILLE, LLC**                    **SECTION: "J" (4)**
**d/b/a FELIX'S RESTAURANT AND OYSTER**
**BAR**

### ORDER

Before the Court is Plaintiff Ciara Weatherspoon's **Motion to Compel (R. Doc. 16)** seeking an order compelling Defendant, 739 Iberville, LLC d/b/a Felix's Restaurant and Oyster Bar ("Felix's") to provide full and adequate responses to her request for productions. The motion is opposed. R. Doc. 30. Plaintiff replied to the opposition. R. Doc. 32. The motion was set for submission on February 23,2022 but was heard with oral arguments on March 15, 2022.

I.    **Background**

Plaintiff Ciara Weatherspoon, ("Weatherspoon") filed the subject action against Defendant 739 Iberville, LLC d/b/a Felix's Restaurant and Oyster Bar ("Felix's") asserting various claims pursuant to Title VII. R. Doc. 1 p, 1. Weatherspoon asserts claims of: (1) Gender/Sex Discrimination; (3) Sexual Harassment: (3) Hostile Work Environment; and (4) Retaliation. *Id*. at p. 9-11.   In addition to back and front pay, compensatory damages and damages for mental and emotional distress, Weatherspoon seeks punitive damages.  *Id*. at 11.

Weatherspoon's employment at Felix's began on January 29, 2018 and continued until May 2019. *Id* at p. 3. During her employment, Weatherspoon, a college student, worked as a host, cashier, and was eventually promoted to the position of server. *Id.* Weatherspoon alleges that she began experiencing sexual harassment from multiple male co-workers as well as several supervisors shortly after her employment began.

According to Weatherspoon, the first incident of harassment occurred in February 2018 when she was training for the cashier position. *Id* at p. 4. She contends that male employees (oyster shuckers and kitchen workers) at the restaurant began touching her and grabbing her without her consent on various places on her body, such as her vagina, breasts, thighs, and buttocks. *Id.* When her co-workers touched her, Weatherspoon alleges that she pushed them away and told them to stop touching her. She further contends that the male employees would make comments such as "your body is so soft" "come sit on my face" and "I want to see you with your clothes off." *Id.*

Weatherspoon reported the instances of unwanted touching and sexual comments to Renald Paul ("Paul"), a manager at Felix's, who at the time was in a consensual romantic relationship with Weatherspoon that predated her employment at the restaurant. *Id.* According to Weatherspoon after reporting the incidents, Paul stated that he would take care of the situation and speak to the restaurant's other managers, Anthony Saltaformaggio ("Saltaformaggio") and Jeff Fuhrman ("Fuhrman"). *Id.* However, Weatherspoon contends that Paul did not take any actions in relation to her allegations. *Id.*

Weatherspoon contends that after reporting the unwanted touching to Paul it not only continued, but it also worsened. *Id.* She contends that male coworkers not only touched her body over her clothing but also put their hands inside of her clothing, including up her shirt and down her pants. *Id* at p. 5.  In addition, Weatherspoon contends that she endured frequent verbal sexual harassment from her male coworkers, who made lewd, unwelcome, sexual statements. *Id.*

Weatherspoon contends that she informed Fuhrman about this behavior multiple times, but no remedial action was taken, and the behavior persisted. *Id*. She further alleges a male manager of Felix's, named Chance, witnessed an incident of unwanted touching. *Id*. In response, Chance then came up behind Ms. Weatherspoon and slid his hand down her back to her buttocks, saying "You need to lighten up" and "learn how to take a joke" *Id.* at p. 6.

Weatherspoon further contends that on multiple occasions, Paul, observed the physical and verbal harassment of Ms. Weatherspoon. *Id.* She contends that between February 2018 and October 2018, she complained verbally about the ongoing harassment to two different managers. *Id.* However, Felix's still took no remedial action to prevent the harassment. *Id.*

According to Weatherspoon, Monterio Cage ("Cage"), a male server at the French Quarter location, harassed her with the most frequency. *Id.* Cage repeatedly trapped her in tight spaces such as the drink area; touched her body, including her breast, buttock, and vagina; put his hands inside her clothing and attempted to touch her breast under her bra; and put his hands inside her pants. *Id.* at p. 7. Weatherspoon alleges that on November 30, 2018, after Cage put his hands down Weatherspoon's pants, she complained verbally and submitted a written complaint by email to Fuhrman regarding the ongoing harassment.   In December 2018, her relationship with Paul ended. R. Doc. 1, p. 6.

After Weatherspoon's written complaint, a meeting was held with Weatherspoon, General Manager Saltaformaggio, Assistant General Manager Fuhrman, and the Banquet Manager Nadine, who was added to the meeting because she was a female. *Id.* During this meeting Weatherspoon alleges that Saltaformaggio repeatedly made light of the situation and clearly found it humorous. *Id.* She further alleges that during this meeting she was discouraged from escalating her complaints to HR or to the press by Nadine. *Id.* Also during this meeting, Weatherspoon was told that she would not work in the same dining room as Cage but they did not mention the other employees who separately harassed her. However, according to Weatherspoon, this change only lasted approximately a few days before she was required to work in the same dining room as Cage. *Id.*

Weatherspoon further contends that around January 2019 Paul touched her without her consent while working at the restaurant. *Id.* at p. 6. After this incident, Weatherspoon contends that she learned of multiple complaints of sexual harassment made against Paul, which resulted in his transfer to the Lakefront location and eventually back to the French Quarter location. *Id.*

In February 2019, Weatherspoon alleges that Felix's retaliated against her for filing a complaint regarding the harassment by moving her from a downstairs dining room, which was the restaurant's busiest space, to the upstairs dining room, which had few customers. *Id.* at p. 8. According to Weatherspoon the move to the upstairs dining room, caused her pay, which was almost entirely based upon tips, to decrease substantially. *Id.*

Even after being moved to the upstairs dining room, Weatherspoon contends that she continued to suffer from sexual harassment from her coworkers. *Id.* She further contends that other female coworkers were being touched inappropriately as well, but most were afraid to report the harassment for fear of retaliation. Weatherspoon contends that around May 2019, she was constructively terminated by Felix's.  Coincidentally, Paul and Cage were also separated from their employment with Felix's in May 2019 purportedly for reason not related to Weatherspoon's allegations. Fuhrman also left his employment at Felix's at an undisclosed time however, he later returned.

Plaintiff filed a Charge of Discrimination with the EEOC on October 8, 2019. Plaintiff received her Notice of Right to Sue on November 10, 2020. Thereafter, Weatherspoon initiated this action on February 3, 2021. R. Doc. 1

### A.   <u>Subject Motion</u>

Two months after the complaint was filed and one month after the defendant answered the complaint, Weatherspoon served Request for Production ("RFP") of Documents, on 739 Iberville, the Defendant. The discovery was originally served on April 2, 2021, and a response was due 30 days later for the RFP's.  Initial responses were due on May 2, 2021, but not received until August 9, 2021.  R. Doc.16-2. The defendant, although past the time for lodging objections, did so anyway and further included general objections in the preface of the responses to the discovery because counsel for Weatherspoon extended the deadline to respond after a meet and confer.  R. Doc. 16-2, Exhibit A; FRCP 34.  While a total of 31 request for production of documents were originally

propounded, the Defendant objected based on vagueness and ambiguity, overbroad and not reasonably calculated to lead to the discovery of admissible evidence to 25 out of the 31 requests. Request 16-2.  The only requests the defendant responded to without objection were RFP 10 and RFP 12.  Of the 31 requests, defendants produced a limited number of documents reserving their objections to RFP 2, 8, 9, 11, 13, 18, 19, 20, 23, 21, 26, 27, 28,  and 29 largely referencing "DEF-0001-DEF-0010", the EEOC investigative file.

The dilatory responses only resulted in 46 pages of documents, which included 26 pages of it's employee handbook. According to Plaintiff, Defendant produced additional documents, but these productions still did not adequately respond to her discovery requests.

In the meantime, on June 29, 2021, Weatherspoon propounded an additional 51 RFP's to the defendant.  *See* R. Doc. 16-3, RFP 32-81. Weatherspoon also propounded 12 Interrogatories, and 13 Request for Admissions ("RFA"). Although it's not clear from the pleadings whether Weatherspoon is contesting the completeness of the second set of discovery, she does point out that rather than provide responses, the defendant repeated its behavior of stating boilerplate objections, asserting the standard objections without regard to the quality of the question and failed to produce any responsive documents. During the hearing, counsel for Weatherspoon acknowledged that she did not seek relief on the second set of discovery requests.

As such, Plaintiff requests an order compelling Defendant to provide full and complete written answers, and documents responsive, to Plaintiff's Requests for Production Nos. 1, 2, 3, 4, 7, 9, 16, 17, 18, 20, 22, 24, 27, 28, 29, and 30 and to provide any and all documents responsive to Plaintiff's requests for production.  Plaintiff also requests that the Court order Defendant to pay reasonable attorney's fees and costs incurred by Plaintiff for the filing of this Motion to Compel.

As with the previous actions by the defendant, it untimely opposed the subject motion. However, in an effort to secure a full picture of the dispute between the parties, the undersigned granted them leave to file an opposition. R. Doc. 29.  Generally, the defendant in its opposition,

glosses or ignores its failure to timely respond or the incompleteness of its response and simply avers that it spent countless hours trying to track down all documents responsive to Plaintiff's discovery requests.  The defendant further alludes to COVID-19 as a cause for their delayed response and also Hurricane Ida, which occurred on August 26, 2021, thru September 4, 2021, as the reason for their inability to produce most of the documents responsive to Weatherspoon's requests.  Therefore, regardless of the afore described events, the Defendant contends that the responsive documents have been produced and request that the Court deny Plaintiff's motion.

## II.    <u>Standard of Review</u>

Discovery of documents, electronically stored information, and things is governed by Federal Rule of Civil Procedure ("Rule") 34. Rule 34 allows a party to request the production of documents and things to the extent of Rule 26(b). Fed. R. Civ. P. 34(a).

Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense . . ." Rule 26(b)(1) specifies that "[i]nformation within the scope of discovery need not be admissible in evidence to be discovered." Rule 26(b)(1) also specifies that discovery must be "proportional to the needs of the case, considering the important of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

Under Rule 26(b)(2)(C), discovery may be limited if: (1) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from another, more convenient, less burdensome, or less expensive source; (2) the party seeking discovery has had ample opportunity to obtain the discovery sought; or (3) the proposed discovery is outside of the scope permitted under Rule 26(b)(1).

Federal Rule of Civil Procedure ("Rule") 37 provides that "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if: . . . (iii) a party fails to answer an interrogatory submitted under Rule 33, or (iv) a party fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B). An "evasive or incomplete" answer or production is treated the same as a complete failure to answer or produce. Fed. R. Civ. P. 37(a)(4).

A motion to compel under Rule 37(a) must also "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1).

## III.   **Analysis**

Having set forth the position of the parties the Court will proceed with setting up the dispute as it is understood.

### A.   **Boilerplate General Objections**

Before addressing the merits of the motion, the Court will address the defendant's assertion of boilerplate general objections. In responses to the first set of requests for production, the defendant submitted the following general objections.

1.   Defendant objects to any discovery request not reasonably limited in scope, not relevant to the parties' claims or defenses in this case or not proportional to the needs of the case or the parties' resources.
2.   Defendant objects to the discovery request to the extent any request is vague, ambiguous or otherwise indecipherable.
3.   Defendant objects to the discovery request to the extent any request seeks information that is privileged and/or confidential or contains proprietary trade secrets or commercial information
4.   Defendant objects to the discovery request as they are overly broad and unduly burdensome.
5.   Defendant objects to the discovery request to the extent that they seek information or documents which are subject to the attorney-client privilege and/or work product privilege and/or were prepared in anticipation of litigation.
6.   Defendant objects to the discovery request to the extent that they are not reasonably calculated to lead to the discovery of admissible evidence nor are they relevant in any manner.

7.      Defendant objects to the discovery request to the extent that discovery is just beginning, and it may not possess "all" information that is responsive at this time.  See Rec. doc. 16-2

However, in a 2015 case written by Judge Michael North, the Court made the following observations about boilerplate objections. *Chevron Midstream Pipelines LLC v. Settoon Towing LLC*, 2015 WL 269051 (E.D. La. January 21, 2015). The Federal Rules of Civil Procedure take a "demanding attitude toward objections." 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2173 (2014). Courts throughout the country have long interpreted the rules to prohibit general, boilerplate objections. *See, e.g.*, *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485–86 (5th Cir. 1990) (simply objecting to requests as "overly broad, burdensome, oppressive and irrelevant," without showing "specifically how each [request] is not relevant or how each question is overly broad, burdensome or oppressive" is inadequate to "voice a successful objection."); *see also Alexander v. FBI,* 192 F.R.D. 50, 53 (D.D.C.2000) (in order to satisfy its burden, the objecting party must make a specific, detailed showing of how an interrogatory is burdensome); *St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508, 511–12 (N.D. Iowa 2000) (a mere statement by a party that an interrogatory is "overly broad, burdensome, oppressive and irrelevant" is not adequate to voice a successful objection); *Wurlitzer Co. (Holly Springs Division) v. U.S. E.E.O.C.*, 50 F.R.D. 421, 424 (N.D. Miss. 1970) (objections to discovery requests must be specific, and general objections that the information sought is irrelevant, immaterial, oppressive, conclusory or already in possession of the requesting party are insufficient). An objection to a discovery request is boilerplate when it merely states the legal grounds for the objection without: (1) specifying how the discovery request is deficient and (2) specifying how the objecting party would be harmed if it were forced to respond to the request. *St. Paul Reinsurance Co* v. *Commercial Financial Corp.*, 198 F.R.D. 508, 512 (N.D. Iowa, W.D. Nov. 22,2000).

Boilerplate and general objections, including those vaguely asserting privilege(s), "are taglines, completely devoid of any individualized factual analysis." *Ceroni v. 4Front Engineered Solutions, Inc.*, 793 F.Supp.2d 1268, 1278 (D. Colo. 2011). A judge should not have to wade through a sea of boilerplate objections only to discover that the objections did not represent the party's actual position but were merely used to make the discovery process more difficult See *Hobley v. Chicago Police Commander Burge*, No. 03–CV–3678, 2003 WL 22682362 at *5 (N.D. Ill. Nov. 12, 2003).

In addition to the general boilerplate objections, Defendant also asserted rather boilerplate objections to almost each and every request for production. For example, in 25/31 responses, Defendant objected as follows:

> "as vague, ambiguous, overbroad, and to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence."

Defendant's objections to both Weatherspoon requests fall "woefully short of the burden that must be borne by a party making an objection to an interrogatory or document request." *Harding v. Dana Transport Inc.*, 914 F. Supp. 1084, 1102 (D.N.J. 1996). This "objection" is not really an objection at all, and it comes nowhere near complying with the requirement of Rule 26 that the party "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

Further, the law regarding whether an objection is appropriate has settled that objections stating that the request "not reasonably calculated to lead to the discovery of admissible evidence" is improper and the proper objection is "not relevant".  For example, Federal Rule of Civil Procedure 26 allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1).

Further, Defendant failed to state how any of the request were vague, ambiguous, or overbroad.  These objections fail to adhere to the tenants of Rule 34 which expressly requires that an objection to a request must specify the part being objected to and permit inspection of the rest. *Heller v. City of Dallas,* 303 F.R.D. 466 ( N.D. Tex. 2014).

There is a reason that specificity is required in these instances. Objections that fail to provide an appropriate factual basis make it difficult for the parties to discuss any alleged defects even informally in a discovery request or response in hope of fixing the defects. *In re Ingersoll*, 238 B.R. 202, 204–05 (D. Colo. 1999). This inhibits the parties' abilities to resolve discovery disputes on their own, as intended by the Rules. *Id*.

Incomplete, evasive, and overly general responses and objections also put the requesting party at a tactical disadvantage in trying to shake free responsive documents. That party's redress under the Rules begins with the Rule 37 conference, which cannot be fairly (and therefore effectively) conducted when the requesting party does not even know the extent of what has been withheld or why. Having determined that (1) general objections are improper and (2) the specific objections asserted by the defendant do not comply with FRCP Rule 34, the Court finds that they are stricken except for objections regarding attorney client privilege if lodged.

**B.   Duty to Preserve and Litigation Hold Obligation of Defense Attorneys**

In reviewing the documents, the Court began to question whether the attorneys noted the existence of the triggering event which would have activated the client's duty to preserve evidence. It is axiomatic that a party must preserve materials that it reasonably knows or can foresee would be material to a legal or potential legal action. *Consolidated Aluminum Corp. v. Alcoa, Inc*., 244 F.R.D. 335, 339 (M.D. La. 2006). The duty to preserve material evidence arises not only during litigation, but also during the period before litigation when a party knew or should have known that litigation was imminent. It does not depend on a court order. *See Condrey v. SunTrust Bank of Ga*., 431 F.3d 191, 203 (5th Cir. 2003). If a party intentionally destroys evidence, the court has

the discretion to impose sanctions. Severe sanctions may include "granting default judgment, striking pleadings, or giving adverse inference instructions." *Equal Employment Opportunity Comm'n v. Resources for Human Development (RHD)*, 843 F.Supp.2d 670, 672 (E.D. La. 2012).

Further, the court in *Zubulake* set forth several steps that counsel should take "to ensure compliance with the preservation obligation": (1) issue a litigation hold at the outset of litigation or whenever litigation is reasonably anticipated; (2) clearly communicate the preservation duty to "key players"; and (3) "instruct all employees to produce electronic copies of their relevant active files" and "separate relevant backup tapes from others." *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 433–34 (S.D.N.Y. 2004). As the *Zubulake* court noted, "[o]ne of the primary reasons that electronic data is lost is ineffective communication with information technology personnel." *Id*. at 434. *See also Yelton v. PHI,* 279 F.R.D. 377 (E.D. La. December 7, 2011).

During the hearing in response to questions by the Court, Counsel for 739 Iberville indicated that he verbally advised the client of its duty to preserve evidence but that he did not have any documentation of the communication.  He represented to the Court that Mr. Orgeron, President of 739 Iberville, was the primary client contact with whom he communicated.

He further acknowledged that neither he nor his co-counsel followed up with the client to confirm that they understood the scope of information that needed to be preserved. He also acknowledged that he did not personally go to the client headquarters after receiving the written discovery requests at any point between April 2021 and August 9, 2021, the date of 739 Iberville's initial responses to Weatherspoon's Request for Production of documents. In this case, the defendant's attorneys confirmed that they knew litigation was likely at the very least when Weatherspoon filed an EEOC complaint. However, they both confirmed that they did not issue a litigation hold notice to their client, even though they communicated the importance of the duty to preserve evidence to their client.

The resulting consequence of the defendant's failure to preserve evidence after the trigger date, which would at the earliest be the filing of the EEOC complaint and at the latest the filing of the Petition in this court, is that some documents that existed regarding the sexual harassment complaint of Ms. Weatherspoon according to counsel were lost.  The question remains, when were the documents lost. The defendant's counsel posits that they were loss at some point during Hurricane Ida which occurred on August 26, 2021 through September 4, 2021.

However, the defendant's own discovery responses contradict this contention. For example in the August 9, 2021 discovery responses, counsel for the defendant made the following representations: (1) they did not maintain a personnel file at the time; (2) they possess no work schedules for the 739 Iberville Felix's location for January 1, 2018 through June 2019 period; (3) they had no documents such as emails, social media messages and text messages of employees because they were not in their custody or control; (4) they had no list of managers contact information; (5) they had no discipline documents reflecting any discipline imposed by them on Weatherspoon; (6) they had no copy of the written complaint of sexual harassment made by the plaintiff; and (7) they had no exit paper work completed by the plaintiff nor documentation created by them regarding her termination.

The exhibit attachments to the motion to compel indicate that their witnesses contradicted the representations made by their counsel.  For example, Mr. Fuhrman testified that the company did have personnel files, in a software app called 7Shifts, that generates a schedule for employees, as well as another software called POSI, which is an accounting software that would have contact information.  However, he stated that he was not asked to help with locating information to respond to discovery.  *See* R. Doc. 16-4, p. 95, ln. 18 and p. 104 ln. 9-13, Fuhrman deposition.

While 739 Iberville's counsel denied having documents regarding discipline, Mr. Fuhrman testified that there were actually counseling records that were printed out.  *Id*. at p. 95, ln 22-25. He further testified that they generally would put counseling records in a cabinet at the 739

12

Iberville location, which would then get moved at the end of the year, but he denied that any of the documents were electronic. *See Id*. at p. 94, ln. 2-6.  Fuhrman remembered giving fifteen (15) to twenty (20) counseling documents regarding discipline to employees.

Fuhrman also confirmed that in November 2019, while the EEOC charge was pending, he switched phones and carriers, so he did not believe he had access to any text messages from/to Ms. Weatherspoon.  *Id.* at p.136, ln. 3-24. Fuhrman also testified that he no longer has emails because his email changed.  It is unclear from the record when the change occurred or even whether he was asked to preserve any communications he may have had with Ms. Weatherspoon directly or with Paul or Cage regarding Weatherspoon.

Further while defendant contends that "it believes" that some of the documents sought were conveniently destroyed in Hurricane Ida when they were placed in a shed at the Lakefront location, it is unclear how this conclusion was reached.  Defendants have no evidence either by inventory list or otherwise of what documents were in the shed.  Interestingly, prior to allegedly being put in the shed, Defense counsel advised the Court that the documents were in the possession of Karen Ortiz ("Ortiz") at their accounting firm, CFO-One. Counsel further advised the Court that Defendants practice was to retrieve boxes from the accounting firm once a year. Using that information, the Court deduces that Defendant would have been in possession of the box containing 2019 documents around January 2021, and until that time the documents were in the possession of Ortiz. After January 2021 and until Hurricane Ida in August 2021, the Defendant would have been in possession of the documents.

Defendant concedes that they had not been to Ortiz's office to confirm that she was not in possession of responsive documents, nor did they inquire about an inventory of the documents that she organized. Moreover, counsel was on notice, since the October 8, 2019, filing of Weatherspoon EEO charge of her intent to pursues legal action regarding her alleged sexual harassment. 739 Iberville and their counsel, who was retained to assist during the administrative process should

have put Ortiz on notice that the documents in her possession needed to be preserved due to possible litigation.

At the hearing, the Defendant offered photos of the lakefront location before and after the storm showing the location of the shed before the storm and showing that the shed was no longer there after the storm. However, the photos also show that there were brown boxes present, the contents of which are unknown.  Counsel for 739 Iberville did confirm that they took no steps to try and salvage the documents in those boxes or confirm if they contained evidence relevant to the subject matter.

Having considered the representations of counsel during the hearing, the Court finds that there is a significant question as to whether their client failed to preserve evidence. It is unclear from the record whether the client was told but failed to preserve evidence by segregating it for the litigation. As it relates to counsel, the only evidence of the execution of their duty to preserve and inform the client of the duty is representation that phone calls were made to 739 Iberville, specifically its President Orgeron and he was told about the duty to preserve. There is no written litigation hold notice in this case, only a verbal litigation hold.

The United States District Court for the District of Columbia has found that, "it is well recognized that an oral litigation hold is insufficient to reasonably protect against the spoliation of evidence." *Borum v. Brentwood Village*, LLC, 332 F.R.D. 38, 46 (D.D.C. 2019). *See also GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 357 (S.D.N.Y. 2012) (finding "a degree of culpability sufficient to permit the imposition of sanctions" where company failed to issue written litigation hold after it contemplated litigation); *Acorn v. Cty. of Nassau*, No. 05-2301, 2009 WL 605859 (E.D.N.Y. 2009) (finding that party acted with gross negligence where it imposed a "verbal" litigation hold rather than a "formal" one); *Kinally v. Rogers Corp,* No. CV-06-2704-PHX-JAT, 2008 WL 4850116 (D. Ariz. 2008) (it is not required that a litigation hold be in writing but sanctions are appropriate when there are justifiable grounds to conclude that a

written litigation hold was necessary or to conclude that relevant information was destroyed simply because a written litigation hold was not circulated at the start of litigation).  Additionally, Counsel cannot issue a litigation hold and assume that they have fulfilled their duty to preserve, instead they must continue to monitor and supervise or participate in a party's efforts to comply with the duty to preserve. *DR Distributors, LLC v. 21 Century Smoking, Inc.,* 513 F. Supp. 3d 839, 933 (N.D. Ill. 2021) (citing The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process,* 20 Sedona Conf. J. 341, 358 (2019).

Therefore, it is the Courts finding that counsel overly relied on their client's representation about the existence of documents but did not physically look for the documents themselves until much later in the discovery process.  At best it appears that counsel asked the client to produce the documents sought in the discovery, but from April 2021-August 2021 counsel received the response that the documents did not exist.  Again , this was well before Hurricane Ida when the documents were allegedly destroyed. Additionally, at this stage it is unclear what instructions were given to 739 Iberville's President, owners, managers, employees, or accountant regarding documents related to this matter from October 2019 thru August 2021, almost a two-year period.

Considering the above evidence, the Court will require additional evidence to assess 739 Iberville's knowledge of its duty to preserve, steps taken or not and whether any additional responsive information exists.  Moreover, the weight of the evidence evaluated by the Court shows that evidence may have been spoiliated which means, "the destruction or the significant and meaningful alteration of evidence." *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (citing *Rimkus Consulting Grp., Inc. v. Cammarata,* 688 F.Supp.2d 598, 612 (S.D.Tex.2010)). Parties are required to submit supplemental briefing on the issue of Spoliation of Evidence.  Plaintiff shall file a supplemental memorandum into the record no later than **March 25, 2022.**  Defendant's response memorandum shall be filed no later than **April 1, 2022.**   The Court will hear the issue by Oral Argument in person in the undersigned courtroom (B-431) on **April 6, 2022 at 11:00 a.m.**

C. **First Request for Production**.

The disputed discovery falls in the following categories: (1) Weatherspoon's, schedule, personnel file, and termination; (2) employee schedules from January 1, 2018- June 1, 2019; (3) management's employee contact information; (4) ESI regarding employees of the defendant and the plaintiff whether text message, social media message or email; and (5) communications between Felix's employees regarding Weatherspoon's complaint. Additionally, Weatherspoon sought the (6) employee files and any complaints of sexual harassment made against Fuhrman, Paul, and Cage; (7) EEOC documents sent by Felix, requested by the EEOC; (8) correspondences between the EEOC and the Defendant; and (9) the EEOC onsite investigation.

1. **Weatherspoon's Schedule, Personnel File and Termination Documents**

RFP 1, 2, 20, and 22 seek copies of Weatherspoon's schedule, personnel file including documentation of the termination of her employment with the defendant.  RFP 20 seeks copies of documents of Weatherspoon's verbal and written complaints.  In response to RFP 2, the defendant states that it did not have employee files only "new hire" documentation and separation notice. The defendant said that they searched their computer and located a separation notice.   They did not, however indicate whether they searched for Weatherspoon's schedule, documents memorializing  her verbal complaints or her written complaints of discrimination.  R. Doc. 16-2, p. 3 and 11-13

During the hearing, both parties confirmed that 739 Iberville failed to produce either schedules, or personnel files of Weatherspoon.  Counsel advised the court that they did not "call " the file a personnel file but a "term file", seemingly semantics. It is clear to the court that the 7 Shift scheduling system has the schedules available but the defendants counsel feigned the inability to print the documents.  However, the record evidence contained printed copies of schedules from 7shifts outside of the operative time period suggesting that this is not a monumental task.

Nevertheless, the defendant is required to produced Weatherspoon's schedule from January 2018 through May 2019 no later than March 27, 2022.

**2.   Employee schedules from January 1, 2018 - June 1, 2019**

RFP 3 sought the work schedules for employees at the location for the period of January 1, 2018 through June 1, 2019.  Defendants feigned objections of over breath, vagueness, ambiguity and unduly burdensomeness.  The same ruling applies to schedules for other employees during the time period referenced above for the same reasons. This would show who worked on the shift with Weatherspoon and if either of the alleged offenders were on duty at the same time as her.

**3.   Management Employee Contact Information from January 1, 2019- June 1, 2019**

RFP 4 seeks the production of documents that show the contact information for management employees during the subject time period. Defendants not only claimed to not understand the request but suggested that it was overbroad when 739's own witness testified that the information should be available.  Further, as pointed out by Weatherspoon, she complained to several managers so the names and contact information of the managers during the period is relevant.

739 Iberville indicated that it did not actually have a list for contacting its management employees.  However, if this were true - then how could they communicate their schedules or send W2's at the end of the year?  The response is at best evasive and at worst obstructive.  The POSI or Point of Sale Information which has been described as an accounting software may have the requested data but certainly the scheduling software should have this information. As such Defense counsel is ordered to personally search POSI and 7Shifts for any responsive documents. 739 Iberville is therefore required to produce the requested information no later than **March 28, 2022.**

### 4. ESI regarding communications between Felix's employees and Weatherspoon

RFP 7 seeks Electronically Stored Information (ESI) regarding communications between Felix's employees and Weatherspoon.  Felix asserted the same previous objections and then communicated that Plaintiff has the same access to such information. The Defendant stated that Fuhrman no longer had access to any emails sent by plaintiff because he switched cell phone carriers after the plaintiff filed the charge and did not try to preserve the text communications.

Most troubling is that it seems little to no effort was made to secure any communications about Weatherspoon's complaint of discrimination. Mr. Paul and Cage, according to 739 Iberville, no longer work for the company and left during the same time period that Weatherspoon was allegedly constructively discharged.  It is not clear how much effort they engaged to try and secure their cooperation.  Further it is not clear whether they had company email accounts or if 739 Iberville attempted to check those accounts for communication. Nevertheless, a more thorough search should be conducted as to : (1) defendant's ESI regarding communications and (2)  attempts to locate and contact the key players Paul and Cage.  Counsel for the defendant is ordered to submit affidavits prepared by the persons who conducted the search detailing their efforts taken to comply with this court's directive no later than **March 28, 2022**.

### 5. Employee files and complaints of sexual harassment against Fuhrman, Paul and Cage

RFP 16, 17, and 18 sought the employee files and complaints of sexual harassment for Fuhrman, Paul and Cage. Counsel for 739 Iberville advised the court that there were no prior complaints of sexual harassment against either Fuhrman, Paul or Cage. The Court finds that this response is adequate unless evidence is developed that contradicts the representation.

However, counsel for 739 Iberville did advise the Court that Cage was suspended during the investigation they conducted into Weatherspoon's allegations. As such, Defendant is ordered to produce any documentation that is evidence of this suspension no later than **March 28, 2022**.

**6.**   **EEOC documents sent by Felix, Requested from Felix by the EEOC, Correspondence between the EEOC and the defendant and the EEOC investigation documents.**

RFP 27, 28, 29, 30,  seeks  documents either 739 Iberville sent to the EEOC, received from the EEOC, requested by them from the EEOC and the EEOC investigation documents. Counsel for 739 Iberville advised the Court that it produced the investigative file. The Defendant claims that the other documents were no longer available through the EEOC portal. Therefore, the Court finds that this response is adequate unless there is evidence to the contrary.

**D.**      **Attorney's Fees**

Having considered the motion, the final issue is Weatherspoon's request for an award of attorneys' fees, which the Court finds is well founded for all of the reasons described above.  Rule 37 requires the Court to award attorneys' fees and cost, "if the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must… require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. *Id.*

As such, Weatherspoon's request for attorney's fees is **GRANTED**. Weatherspoon shall file a Motion to Fix Attorney Fees no later than **March 28, 2022**, pursuant to those instructions provided below. The defendant shall file into the record any opposition to the Motion to Fix Attorney Fees no later than **April 4, 2022.** The motion shall be set for submission on **April 13, 2022**, to be heard without oral argument.

**IV.**   **Conclusion**

Accordingly,

**IT IS ORDERED** that the Plaintiff's **Motion to Compel (R. Doc. 16)** is **GRANTED in part and DENIED in part.**

**IT IS FURTHER ORDERED** that the motion is **GRANTED** to the extent Defendant shall supplement its production to **Request for Production Nos. 1, 2, 3, 4, 7, 9, 20, 22** as described above no later than **March 28, 2022.**

**IT IS FURTHER ORDERED** that all general objections and boilerplate objections to Plaintiff requests that are not in compliance with the Federal Rules of Civil Procedure are **STRICKEN,** except where attorney-client privilege is asserted.

**IT IS FURTHER ORDERED** that Defense counsel shall personally search the POSI and 7Shifts application for any documents responsive to Plaintiff's requests and produce said documents no later **March 28, 2022.**

**IT IS FURTHER ORDERED** that Defendant produce any documentation that is evidence of the suspension of Monterio Cage during the investigation by 739 Iberville into Plaintiff's allegations no later than **March 28, 2022**.

**IT IS FURTHER ORDERED** that that motion is **DENIED** with respect to **Request for Production Nos. 16, 17, 18, 27, 28, 29, and 30.**

**IT IS FURTHER ORDERED** that parties will submit briefing to the Court on the issues of Spoliation.  Plaintiff shall file a supplemental memorandum into the record no later than **March 25, 2022.**  Defendant's response memorandum shall be filed no later than **April 1, 2022.**   Oral argument on the issue will take place in person on **April 6, 2022**, **at 11:00 a.m**. in the undersigned United States Magistrate Judge's Courtroom located at 500 Poydras Street, Room B-431, New Orleans, Louisiana.[1]

**IT IS FURTHER ORDERED** that counsel for the defendant is to file into the record affidavits prepared by the persons who conducted the search of ESI and key players no later than **March 28, 2022**.  The affidavit should consist of the efforts taken in their thorough search of : (1)

---

[1] *See* https://www.laed.uscourts.gov/sites/default/files/pdfs/roby/covid_protocol.pdf for Courtroom Protocol During COVID-19 Pandemic

defendant's ESI regarding communications; and (2)  attempts to locate and contact the key players Paul and Cage.

**IT IS FURTHER ORDERED** that Plaintiff shall file a motion to fix attorney's fees into the record by **March 28, 2022**, along with: (1) an affidavit attesting to their attorney's education, background, skills, and experience; (2) sufficient evidence of rates charged on similar cases by other local attorneys with similar experience, skill, and reputation; and (3) the documentation required by Local Rule 54.2. Any opposition to the fee application shall be filed no later than **April 4, 2022**. The motion shall be set for submission on **April 13, 2022**, to be heard without oral argument.

New Orleans, Louisiana, this 18th day of March 2022.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**